United States District Court
Southern District of Texas
**ENTERED**
August 12, 2022
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| LINDSEY BAGE, individually and as the heir of KIRK ANDREW SWARTZ, and as the representative of the estate of KIRK ANDREW SWARTZ, | § § § § § § | CIVIL ACTION NO. 3:20-cv-00307 |
| Plaintiff. | § § | |
| VS. | § § | |
| GALVESTON COUNTY, *et al.*, | § § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

There are two pending motions for summary judgment before me: (1) the Healthcare Defendants[1] Motion for Summary Judgment; and (2) Galveston County's Motion for Summary Judgment. *See* Dkts. 58 and 59. Having reviewed the briefing, the record, and the applicable law, and for the reasons explained below, I recommend the Court **GRANT** the motions on Plaintiff's constitutional claims, **DISMISS** Galveston County from the case, **DECLINE** to exercise supplemental jurisdiction over the remaining state-law claims, and **REMAND** this case to state court for further proceedings.

## FACTUAL BACKGROUND

This case involves the unfortunate death of Kirk Andrew Swartz ("Swartz"), which occurred after his incarceration at the Galveston County Jail. Plaintiff Lindsey Bage ("Plaintiff")—individually, as Swartz's heir, and as the representative

---

[1] "Healthcare Defendants" refers to Dr. Garry Killyon, Kathy White a/k/a Kathy Jeans Jordan, Boone-Chapman Benefit Administrators, Inc., Soluta, Inc., and Soluta Health Inc.

of Swartz's estate—has sued Defendants,[2] arguing that their deliberate indifference to Swartz's serious medical needs and delayed medical care resulted in his death. Plaintiff further argues that Defendants' policies and procedures were deficient and directly led to Swartz's delayed medical care and ultimate death.

Below is a timeline of relevant events:

| Date | Time | Event |
|------|------|-------|
| July 5 | 8:24 a.m. | Galveston Police Department officers arrest Swartz—a 53-year-old man—for public intoxication. *See* Dkt. 60 at 1. |
| July 5 | 9:07 a.m. | Two Galveston Police Department officers bring Swartz into the pre-booking area of Galveston County Jail. *See* Dkt. 63 at 4. At that time, unbeknownst to Swartz and Defendants, Swartz had Methicillin-resistant Staphylococcus aureus ("MRSA") pneumonia, an extremely dangerous medical condition. *See* Dkt. 59-1 at 7. |
| July 5 | 10:32 a.m. | Swartz is moved to cell L125A, which is located in the booking area. *See* Dkt. 63 at 4. |
| July 5 | 12:54 p.m. | Swartz fills out an intake screening form, stating that he does not have any medical problems that require immediate attention. *See* Dkt. 61 at 1. |
| July 5 | 1:15 p.m. | Swartz is pulled from cell L125A for the booking process. *See* Dkt. 63 at 4. |
| July 5 | 1:38 p.m. | Swartz returns to cell L125A. *See id.* |
| July 5 | 2:55 p.m. | Swartz exits cell L125A and goes to the booking desk to use an inhaler. *See id.* |
| July 5 | 2:58 p.m. | Swartz returns to cell L125A. *See id.* at 5. |
| July 5 | 8:18 p.m. | Swartz is moved to booking cell L123A. *See id.* |
| July 5 | 9:10 p.m. | Swartz's vitals are checked at the medical station in the booking area. *See id.* |
| July 5 | 9:14 p.m. | Swartz returns to cell L123A. *See id.* |

---

[2] "Defendants" refers collectively to Galveston County and the Healthcare Defendants.

| | | |
|---|---|---|
| July 6 | 9:27 a.m. | Deputy A. Laureano ("Deputy Laureano") observes Swartz sitting in his cell shaking, with his jail issued jumper pulled down around his ankles. *See id.* at 2. Deputy Laureano asks Nurse Casey Flores ("Nurse Flores") to check on Swartz. *See id.* |
| July 6 | 9:42 a.m. | Deputy N. King ("Deputy King") and Medical Technician Markeshia Dumas ("Dumas") enter cell L123A to dispense medication to inmates. *See id.* at 5. When Deputy King entered cell L123A, he "observed Swartz sitting up on the bench with his jail issued jumper around his ankles" and "an unknown clear liquid coming from his mouth." Dkt. 64 at 1. Swartz then "fell to a laying position." *Id.* |
| July 6 | 9:44 a.m. | Deputy King and Dumas leave cell L123A. Deputy King immediately goes to the medical station to find Nurse Flores to let her know what is happening with Swartz. *See* Dkt. 63 at 5; Dkt. 64 at 1. |
| July 6 | 9:45 a.m. | Nurse Flores enters cell L123A and checks on Swartz. *See* Dkt. 63 at 5. Because Nurse Flores is unable to get Swartz to respond, she instructs Deputy King to retrieve a wheelchair. *See id.* at 2. |
| July 6 | 9:50 a.m. | Deputy King enters cell L123A with a wheelchair. *See id.* at 5. |
| July 6 | 9:52 a.m. | Deputy King and Nurse Flores place Swartz in a wheelchair and transport him to the medical station. *See* Dkt. 64 at 1. |
| July 6 | 9:55 a.m. | Dr. Gary Killyon ("Dr. Killyon") notes that Swartz is "unresponsive to noxious stimuli" with "no detectible pulse" when he arrived at the medical station. Dkt. 65 at 2. Swartz is "immediately placed on a stretcher, chest compressions started, EMS notified, [and] O2 started with an ambu bag." *Id.* Swartz is then taken to a treatment room where an automated external defibrillator was applied and "[Basic Life Support] was continued until the Paramedics |

arrived and [Advanced Cardiovascular Life Support] was deferred to their care." *Id.*

July 6   10:03 a.m.   Galveston Emergency Medical Services ("EMS") enters the jail's medical station and begins providing medical care to Swartz. *See* Dkt. 63 at 5. EMS performed "[s]everal rounds of CPR" before Swartz "eventually developed electrical activity on the monitor and a palpable pulse was obtained." Dkt. 65 at 2. *See also* Dkt. 68 at 3–4.

July 6   10:21 a.m.   EMS transports Swartz from the jail to the University of Texas Medical Branch ("UTMB") for further treatment. *See* Dkt. 63 at 5.

Swartz died at UTMB on the morning of July 7. *See* Dkt. 69-1 at 22, 51. Although no autopsy was performed, *see id.* at 51, Swartz's medical records indicate that he "was suffering from severe sepsis with sepsis shock, Pneumonia, acute respiratory failure, acute kidney failure, Acidosis, [chronic obstructive pulmonary disease], cardiac arrest, and hypertension[,] along with a number of other health issues." *Id.* at 22.

## PROCEDURAL HISTORY

In July 2020, Plaintiff sued Defendants in Texas state court, asserting claims for: (1) violations of Swartz's constitutional rights under the Fourth, Eighth, and Fourteenth Amendments pursuant to 42 U.S.C. §§ 1983 and 1988; (2) violations of 42 U.S.C. § 1985; (3) medical negligence pursuant to Chapter 74 of the Texas Healthcare Liability Act; (4) a conditions-of-confinement claim; (5) failure to assess; (6) failure to monitor; (7) failure to supervise; and (8) failure to train. *See* Dkt. 1-3 at 22–32. Defendants timely removed the case to this Court based on federal-question jurisdiction. *See* Dkt. 1.

The Healthcare Defendants and Galveston County have separately moved for summary judgment, advancing significantly similar arguments. *See* Dkts. 58 and 59. Specifically, Defendants all argue that: (1) Plaintiff lacks standing to pursue her constitutional claims under 42 U.S.C. § 1983 because she has not demonstrated that she is Swartz's biological child or heir; (2) even if Plaintiff has standing, the

4

evidence conclusively establishes that Defendants did not act with deliberate indifference to Swartz's serious medical needs, which is a requisite showing where a pretrial detainee complains of inadequate medical treatment under the Fourteenth Amendment; and (3) even if Plaintiff could establish that a material fact issue exists as to whether Defendants' acted with deliberate indifference, Plaintiff cannot show that Defendants' deliberate indifference more likely than not caused Swartz's death, which is a necessary showing to recover for a wrongful-death claim under 42 U.S.C. § 1983. In addition, the Healthcare Defendants argue Plaintiff has not provided sufficient evidence to support the requested damages.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact issue is material only "if its resolution could affect the outcome of the action." *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *See Rodriguez v. Webb Hosp. Corp.*, 234 F. Supp. 3d 834, 837 (S.D. Tex. 2017).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once satisfied, the burden shifts to the nonmovant to show the existence of a genuine fact issue for trial. *See id.* at 324. To do so, the "nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 584 (S.D. Tex. 2015). In ruling on a motion for summary judgment, I must construe "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020).

**OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE**

This case is strikingly similar to another case I handled involving most of the same attorneys, in which a decedent's family members brought near-identical claims against Galveston County for the alleged wrongful death of an individual incarcerated at the Galveston County Jail. *See Cortez-Burlingame v. Galveston Cnty.*, No. 3:18-CV-00183, 2020 WL 2062263, at *1 (S.D. Tex. Apr. 27, 2020), *report and recommendation adopted sub nom. Burlingame v. Galveston Cnty.*, No. 3:18-CV-00183, 2020 WL 4018830 (S.D. Tex. July 16, 2020), *aff'd sub nom. Cortez-Burlingame v. Galveston Cnty.*, No. 20-40540, 2022 WL 1114413 (5th Cir. Apr. 14, 2022).

As in that case, Galveston County has objected to Plaintiff's summary-judgment evidence on multiple grounds, including: (i) failure to provide citations to evidence in support of statements made; (ii) non-specific citations to voluminous exhibits; and (iii) citations to evidence that does not actually support the factual allegations. *See* Dkt. 94 at 1–2. These objections are well-grounded, and I once again find very helpful the redlined version of Plaintiff's Response to Defendants' Motions for Summary Judgment that Galveston County has supplied, *see* Dkt. 94-1, which makes abundantly clear that Plaintiff routinely misstated the summary-judgment record, failed to provide proper citations, and made non-specific citations to voluminous exhibits. That previous sentence is nearly word-for-word what I wrote in *Cortez-Burlingame*. But my message went unheeded.

At one point, Plaintiff goes 919 words—or 4,558 characters (excluding spaces)—without a single record citation. *See* Dkt. 88 at 12–15. If that weren't enough, the next two record citations are to 78- and 65-page exhibits, respectively, without a pincite for me to reference.[3] *See id.* at 15. At other times, Plaintiff cites to

---

[3] It's not lost on me for one moment that Plaintiff is not the only party guilty of this transgression. *See, e.g.*, Dkt. 58 at 12 n.22 (citing "generally" to "Exhibit A," which consists of 153 disjointed pages of medical records); *id.* (citing "generally" to Exhibit D, which is inexplicably comprised of 12 separate docket entries—Dkt. 70 through Dkt. 82— totaling 178 pages). "It is wholly insufficient for a party to cite to the record in the most

entire deposition transcripts without including any temporal notation or page-line citation that would lead me to the specific portion of the deposition she supposedly refers to in her briefing. *See id.* at 11, 15. Even more troubling, one of the deposition transcripts Plaintiff frequently cites is nowhere to be found in the summary-judgment record. *See* Dkt. 88-7. Plaintiff's "briefing"—and I use that term with utmost generosity—will not cut it. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment," *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 408 (5th Cir. 2011), and I will not do so here.

I cannot believe I am forced to repeat myself, but "Plaintiff['s] conduct is inexcusable and should not be tolerated in federal court or, for that matter, any court." *Cortez-Burlingame*, 2020 WL 2062263, at *3.

With that said, I am going to deny Galveston County's objections to the summary-judgment evidence as moot. To be clear, I do so not because I find the objections are wholly without merit. Rather, even if I were to consider the entirety of Plaintiff's summary-judgment evidence, the evidence is insufficient to create a genuine issue of material fact for the reasons discussed below. *See Dall. Police Ass'n v. City of Dallas*, No. 3:03-CV-0584D, 2004 WL 2331610, at *1 n.4 (N.D. Tex. Oct. 15, 2004) ("Because the court's decision is not affected even if the court assumes the objections have merit, it need not decide the objections and it overrules them as moot."). Nevertheless, I assure the parties that I will not consider any factual allegations unsupported by references to specific evidence. *See Smith ex rel. Est. of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004) (asserting that parties should include specific, not general, citations to summary judgment evidence).

---

skeletal way, leaving the Court to conduct an open-ended review of each cited document to determine whether it might contain evidence supporting the party's arguments. This is an incredible waste of valuable—not to mention, finite—judicial resources." *Wimberley v. Beast Energy Servs., Inc.*, No. 3:19-CV-00096, 2022 WL 658717, at *12 (S.D. Tex. Mar. 4, 2022).

## ANALYSIS

### A.   STANDING

Standing is a threshold jurisdictional question that determines whether I can hear this case; thus, I must address it before making a merits determination.

State wrongful-death and survival statutes are incorporated by 42 U.S.C. § 1988 as remedies under 42 U.S.C. §§ 1983 and 1985. *See Rodgers v. Lancaster Police & Fire Dep't*, 819 F.3d 205, 209 (5th Cir. 2016). Therefore, a party must have standing under the state wrongful-death or survival statutes to bring a claim under §§ 1983, 1985, or 1988. *See Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004); *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 391 (5th Cir. 1992).

The Texas Wrongful Death Statute ("TWDS") provides: "An action to recover damages as provided by this subchapter is for the exclusive benefit of the surviving spouse, children, and parents of the deceased." TEX. CIV. PRAC. & REM. CODE § 71.004(a). Under the Texas Survival Statute ("TSS"), "[a] personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person." *Id.* § 71.021(b). Simply put, the TSS preserves the estate's claim for the decedent's personal injuries, while the TWDS provides recovery for the injuries of the statutorily identified classes of persons, separate from the claims of the estate. *See Turk v. Mangum*, 268 F. Supp. 3d 928, 932 (S.D. Tex. 2017).

Defendants argue Plaintiff lacks standing under both the TWDS and TSS because Plaintiff has not proven that she is Swartz's biological daughter, heir, or the representative of his estate. Predictably, Plaintiff insists Defendants are wrong, arguing that she has established paternity by virtue of declaration testimony.

The TWDS and TSS have different standards for establishing paternity in cases involving illegitimate children. Unfortunately, the parties, at times, comingle their arguments regarding the two different standards to reach their desired result. Because I find Plaintiff has standing under the TWDS, I decline to decide whether Plaintiff has standing under the TSS.

If paternity is questioned in a wrongful-death action, the alleged child must prove by clear and convincing evidence that she is the filial descendant of the deceased. *See Garza v. Maverick Mkt., Inc.*, 768 S.W.2d 273, 275–76 (Tex. 1989). In *Garza*, after explaining the degree of proof that "would rise to the level of clear and convincing evidence in a particular case cannot be predicted," the Texas Supreme Court wrote: "If, however, at least *some evidence of paternity* is offered in a suit under the Wrongful Death Act, an illegitimate child is entitled to a chance to argue to the trier of fact that he is the child of the alleged father." *Id.* at 276 (emphasis added). "As to what evidence is clear and convincing," the high Court explained, "*a fact finder must decide that question in each case*." *Id.* (emphasis added). As far as unequivocal statements go, the italicized language is about as straightforward as it gets—"some evidence of paternity" gets you to a jury, where the jury gets to decide whether the evidence rises to the level of clear and convincing.

The *Garza* Court noted that blood tests, physical resemblance, prior statements by the purported father, and periods of conception and gestation are all evidence that a trier of fact may look to in determining whether there is a biological link. *See id.* But by no means were these examples intended to guide a trial court's standing inquiry. Rather, the Court provided this non-exhaustive list to demonstrate the types of evidence an illegitimate child may use to establish a paternal relationship by clear and convincing evidence. Recall, however, once an illegitimate child has offered "at least some evidence of paternity," the determination of whether that evidence proves a paternal relationship by clear and convincing evidence belongs to a jury. *Id.* ("If, however, at least some evidence of paternity is offered in a suit under the Wrongful Death Act, an illegitimate child is entitled to a chance to argue to the trier of fact that he is the child of the alleged father."). Further, earlier in the opinion, the *Garza* Court held that the TWDS does not require a plaintiff attempting to prove paternity to comply with standing-

related requirements found in the Texas Family Code or Texas Probate Code.[4] *See id.* at 275.

In other words, unlike the TSS, there is no real metric for what amounts to "some evidence" of a paternal relationship sufficient to establish standing under the TWDS. *See Turk*, 268 F. Supp. 3d at 934–37 (explaining that "Texas courts have incorporated the Texas Estates Code into TSS actions in determining whether a party has capacity to sue" but have "expressly decline[d] to incorporate the requirements of the Texas Family Code and Texas Estates Code when interpreting whether a person is within the classes of persons entitled to sue under the TWDS").

Though the Texas Supreme Court has provided helpful guideposts for courts to determine whether a plaintiff has established a paternal relationship by clear and convincing evidence, as best I can tell, the standing inquiry, which requires only "some evidence of paternity," is a very low threshold. And while there certainly is a floor to this threshold, there is no doubt in my mind that Plaintiff has presented at least *some* evidence of paternity sufficient to confer standing under the TWDS. *See* Dkt. 88-1 and Dkt. 88-2.

## B.   DELIBERATE INDIFFERENCE

Plaintiff alleges that Defendants violated the United States Constitution by providing Swartz with inadequate medical treatment. As the Fifth Circuit noted earlier this summer:

> The Constitution imposes a duty on the state to provide for the safety and wellbeing of the people it incarcerates. For people already convicted of a crime, this duty stems from the Eighth Amendment's prohibition on cruel and unusual punishment. For those like [Swartz], who have not yet faced trial, it stems from due process instead. The state's obligation is the same in both contexts: It must provide for detainees' basic human needs, including food, clothing, shelter, medical care, and reasonable safety. The Fourteenth Amendment thus

---

[4] On January 1, 2014, the Texas Estates Code replaced the Texas Probate Code. *See* WILLIAM D. PARGAMAN, *Story of the Texas Estates Code*, 6 Est. Plan. & Community Prop. L. J. at 344–45.

bars law enforcement from responding to a detainee's serious medical needs with deliberate indifference.

*Williams v. City of Yazoo*, --- F.4th ---, 2022 WL 2762707, at *4–5 (5th Cir. July 15, 2022) (cleaned up).[5]

Turning to the legal framework of a medical-treatment case, it has long been the law that Constitutional rights are not violated unless a government official acts with deliberate indifference to the pretrial detainee's medical needs. *See Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 754 (5th Cir. 2001). Make no mistake: deliberate indifference is "an *extremely* high standard to meet." *Id.* at 756 (emphasis added). In order to establish deliberate indifference:

> The [pretrial detainee] must first prove objective exposure to a substantial risk of serious harm—in other words, the [pretrial detainee] must prove a serious medical need. Second, the [pretrial detainee] must prove the officials' subjective knowledge of this substantial risk. Third, the [pretrial detainee] must prove that the officials, despite their actual knowledge of the substantial risk, denied or delayed the [pretrial detainee's] medical treatment. Finally, the [pretrial detainee] must prove that the delay in or denial of medical treatment resulted in substantial harm, such as suffering additional

---

[5] In her lawsuit, Plaintiff alleges that Defendants' failure to provide adequate medical care violated Swartz's constitutional rights under the Fourth Amendment, Eighth Amendment, and Fourteenth Amendment. *See* Dkt. 1-3 at 22, 30. As a pretrial detainee, Swartz's right to medical attention derives from the Fourteenth Amendment, not the Fourth Amendment or Eighth Amendment. The Fourth Amendment's prohibition against unreasonable seizures is primarily directed to the initial act of restraining an individual's liberty, such as an investigatory stop or arrest, and has no application to pretrial detainees. *See Valencia v. Wiggins*, 981 F.2d 1440, 1443–45 (5th Cir. 1993). "[A]fter the initial incidents of a seizure have concluded and an individual is being detained by police officials but has yet to be booked, an arrestee's right to medical attention, like that of a pretrial detainee, derives from the Fourteenth Amendment." *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1996). *See also Brothers v. Klevenhagen*, 28 F.3d 452, 456 (5th Cir. 1994) (holding that the Fourteenth rather than the Fourth Amendment protected a pretrial detainee against the deliberate use of excessive force). The Eighth Amendment's prohibition against cruel and unusual punishment provides the source of liability when a convicted prisoner's medical needs are ignored, but pretrial detainees must "look to the procedural and substantive due process guarantees of the Fourteenth Amendment to ensure provision of these same basic needs." *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000).

pain. Importantly, disagreement about the recommended medical treatment is generally not sufficient to show deliberate indifference.

*Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019) (cleaned up). *See also Estate of Bonilla v. Orange Cnty.*, 982 F.3d 298, 305 (5th Cir. 2020) ("To prove deliberate indifference, the Plaintiffs must show that the defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, that the defendants actually drew the inference, and that the defendants disregarded that risk by failing to take reasonable measures to abate it." (cleaned up)).

A showing of deliberate indifference requires the pretrial detainee to submit evidence that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quotation omitted). "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *James v. Harris Cnty.*, 577 F.3d 612, 617–18 (5th Cir. 2009) (quotation omitted). *See also McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) ("Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind."). Critically, "deliberate indifference exists wholly independent of an optimal standard of care." *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006). *See also Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001) (explaining that a mere disagreement with medical treatment is not deliberate indifference). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference." *Gobert*, 463 F.3d at 346. To survive summary judgment, Plaintiff must raise a triable issue of fact that Defendants acted with deliberate indifference.

Fairly summarized, Plaintiff generally argues that Defendants could and should have done more to save Swartz's life. Plaintiff begins by casting aspersions

on the Galveston County Jail's intake and monitoring processes, arguing that jail officials failed to take various precautionary measures that possibly would have alerted them to Swartz's serious health issues. Plaintiff insists that jail officials knew of but disregarded Swartz's various "chronic illnesses," highlighting that his "medical history was well documented and known to Galveston County" because "Swartz ha[d] been in Galveston jail custody on numerous past occasions." Dkt. 88 at 7–8. However, Plaintiff never explains how any precautionary measures would have notified jail officials that Swartz was suffering from pneumonia with advanced septicemia or otherwise resulted in an early diagnosis of Swartz's other health conditions.

Plaintiff then pivots to the events that took place on January 6, 2018. First, she argues that Dumas, the Medical Technician who accompanied Deputy King into cell L123A at 9:42 a.m., "should have immediately started life-saving protocols and called EMS." *Id.* at 14. Plaintiff further faults Deputy King for not taking direct action and instead leaving to summon other personnel to assist. *See id.* at 15. Plaintiff also complains that "[n]o life-saving measures took place" after Nurse Flores arrived. *Id.* at 12. Plaintiff insists this "lack of training was the moving force and direct cause of the delay of about 10 minutes just to place [Swartz] in a wheelchair," which Plaintiff avers "more likely than not caused [Swartz's] death since he was revived with CPR even after being pulseless for over 10 minutes." *Id.* at 14. Plaintiff also blames Dr. Killyon for performing a "prolonged" examination to determine whether Swartz had a pulse when he first arrived at medical, which she argues "lasted for an unreasonable amount of time" before Dr. Killyon ultimately "called 911, placed [Swartz] on the table, and started CPR." *Id.* at 15.

Based on my careful review of the summary-judgment record before me, which I have summarized in the *Factual Background* section of this Memorandum and Recommendation, it is patently obvious that Plaintiff cannot establish Defendants acted with deliberate indifference to Swartz's medical needs. To be

sure, the Fifth Circuit made this abundantly clear in its decision affirming this Court's dismissal in *Cortez-Burlingame*.

Without minimizing what took place in this case, the conduct at issue pales in comparison to that in *Cortez-Burlingame*. In that case, 54 days passed between the date Jorge Cortez ("Cortez") entered the Galveston County Jail and his eventual transfer to UTMB. *See* 2020 WL 2062263, at *1–2. In that time, Cortez "made numerous complaints about health-related matters" and was examined over 10 times by medical personnel at the Galveston County Jail. *Id.* at *1. Only after Cortez's condition rapidly deteriorated was he transferred to UTMB, where he was diagnosed with mesothelioma—a severe, aggressive, and deadly form of cancer. Cortez died less than three weeks later. *See id.* at *2.

Faced with that record, the Fifth Circuit agreed that "[w]hile the care Cortez received may have been negligent," evidence that the defendants did not provide him with proper medical treatment or failed to timely diagnose his true medical condition "fail[ed] to create the requisite genuine issue of material fact as to deliberate indifference." *Cortez-Burlingame v. Galveston Cnty.*, No. 20-40540, 2022 WL 1114413, at *2 (5th Cir. Apr. 14, 2022).

Compare the 54 days in *Cortez-Burlingame* with the 10–15 minutes of inaction Plaintiff complains of in this case. Indeed, this was not a case in which a pretrial detainee complained numerous times about health issues but was ignored. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (deliberate indifference can be "manifested by prison doctors in their response to the [pretrial detainee] needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed"). Nothing in the record indicates Swartz complained even once. In fact, Swartz affirmatively told jail personnel upon intake on July 5 that he did not have any medical problems that required immediate attention. *See* Dkt. 61 at 1. Nor was this a situation where a pretrial detainee's need for medical treatment went unattended for an unreasonable amount of time. Swartz was incarcerated at Galveston County Jail

for a little over 25 hours, and there is no evidence that Swartz exhibited any behavior that would indicate he needed immediate medical attention until the morning of July 6. *See* Dkt. 64 at 1.

While the initial case report prepared by Detective M. Remmert ("Detective Remmert") of the Galveston County Sheriff's Office Investigation Division does indicate that Deputy Laureno noticed Swartz shaking in his cell on July 6 around 9:27 a.m., Deputy Laureno also claims that she immediately notified Nurse Flores, whom Deputy Laureno then "saw . . . walk to cell L123A to observe Swartz" at 9:29 a.m. Dkt. 63 at 2. Given that Detective Remmert's review of the surveillance footage, which is contained in the supplemental case report, states that Nurse Flores entered Swartz's cell at 9:45 a.m., it is likely that Deputy Laureno misjudged the time when she first observed that Swartz was in need of medical assistance and sought help. *See id.* at 5. Regardless, even viewed in the light most favorable to Plaintiff, a 16-minute delay between the time Deputy Laureno sought medical assistance and when Nurse Flores arrived on the scene does not demonstrate that officials, despite their actual knowledge of the substantial risk, denied or delayed Swartz's medical attention. *See Strother v. Booty*, No. 11-CV-73, 2011 WL 3115540, at \*4 (W.D. La. June 15, 2011) ("It is common knowledge that people in the 'free world' outside of jail typically have to wait over fifteen or twenty minutes to be seen by a nurse or emergency room physician."). Again, Deputy Laureno claims she *immediately* sought medical assistance. *See* Dkt. 63 at 2.

Additionally, there is no evidence that medical personnel purposefully treated Swartz incorrectly or intended to inflict pain or harm of any kind. The surveillance footage demonstrates that within minutes of Deputy King noticing Swartz's need for medical attention, Nurse Flores was in cell L123A providing medical assistance. *See* Dkt. 64 at 1. *See also* Dkt. 63 at 5 (noting that surveillance footage showed Nurse Flores arrive at Swartz's cell approximately three minutes after Deputy King went to the medical station to fetch help). While Plaintiff may complain that Deputy King did not personally intervene to initiate life-saving

protocols when he noticed Swartz was in distress, Deputy King's decision to go to the medical station in the booking area to request assistance is consistent with the Texas Jail Commission's guidelines, which dictate that jail staff are supposed to contact on-site medical staff. *See* Dkt. 59-1 at 7. Further, Plaintiff's complaint that roughly eight minutes passed between the time Nurse Flores first arrived at Swartz's cell and when Deputy King returned with a wheelchair is wholly insufficient to demonstrate a wanton disregard for Swartz's medical needs. *See McCormick*, 105 F.3d at 1061 ("Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind.").

Plaintiff's attempt to show deliberate indifference by pointing to Dr. Killyon's "prolonged" examination to determine whether Swartz had a pulse when he first arrived at medical, which Plaintiff argues "lasted for an unreasonable amount of time," is entirely without merit. Dkt. 88 at 15. A disagreement with the medical attention an inmate received, standing alone, is insufficient as a matter of law to demonstrate deliberate indifference. *See Gibbs*, 254 F.3d at 549 ("Disagreement with medical treatment alone cannot support a claim under § 1983.").

On a final note, Plaintiff's allegation that jail officials failed to take various preventative measures, which she claims possibly delayed the recognition or diagnosis of Swartz's health issues, is made with the benefit of hindsight. Simply alleging that officials could have done more is insufficient to demonstrate deliberate indifference because one can always second-guess actions taken by officials or claim that extra precautions could have influenced the result. *See James*, 577 F.3d at 617–18 ("Deliberate indifference . . . must amount to an intentional choice, not merely an unintentionally negligent oversight." (quotation omitted)); *Burrell v. Griffith*, 158 F.R.D. 104, 106-07 (E.D. Tex. 1994) (explaining that an argument that "more could have been done" or disagreeing "with what was actually done" is insufficient to demonstrate deliberate indifference). Tellingly,

even Plaintiff's medical expert, Dr. Jasdeep Dalawari, does not opine that any Galveston County Jail personnel ignored Swartz's need for medical attention. *See generally* Dkt. 59-2. Rather, he simply concludes that the culmination of events described above "more likely than not, resulted in Mr. Swartz's death." *Id.* at 6.

In sum, based on this record, it cannot be said that officials "refused to treat [Swartz], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quotation omitted). Because Plaintiff has failed to establish that Defendants acted with deliberate indifference to Swartz's medical needs, summary judgment is appropriate on Plaintiff's Fourteenth Amendment claim.[6] Because I find Defendants' arguments on deliberate indifference dispositive, I need not address the other arguments raised by Defendants as independent reasons for dismissal of Plaintiff's lawsuit.

## C.   THE FAILURE TO DEMONSTRATE AN UNDERLYING VIOLATION OF SWARTZ'S CONSTITUTIONAL RIGHTS IS FATAL TO PLAINTIFF'S OTHER CLAIMS UNDER 42 U.S.C. §§ 1983 AND 1985

### 1.   *Supervisory Liability Under 42 U.S.C. § 1983*[7]

Although not stated as succinctly, Plaintiff generally asserts through various causes of action that Defendants failed to provide adequate supervision and security and failed to train and manage—or improperly trained and managed—

---

[6] This also disposes of Plaintiff's conditions-of-confinement claim, as courts apply the same deliberate-indifference standard to conditions-of-confinement claims as they do where an inmate complains of inadequate medical care. *See Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) ("The deliberate indifference standard can be appropriately applied to the plaintiff's allegations regarding the conditions of confinement as well as to his allegations regarding the failure of the prison to provide him adequate medical care.").

[7] Plaintiff also argues that Sheriff Henry Trochesset ("Sheriff Trouchesset") "is the final policymaker for the jail and law enforcement for the county," adopted the policy to delay care, and is therefore "personally liable" under some unspecified theory of § 1983 liability. Dkt. 88 at 18. As Plaintiff is well aware, she specifically requested that her claims against Sheriff Trouchesset be dismissed over a year ago, *see* Dkt. 40, and those claims were dismissed by court order. *See* Dkt. 42.

their agents or employees to assure adequate delivery of medical care, and that these failures proximately caused Swartz's death. *See* Dkt. 1-3 at 27–29.

A supervising official can be held liable if that official, with subjective knowledge of serious harm, fails to supervise a subordinate, and this failure causes a pretrial detainee's rights to be violated. *See Petzold*, 946 F.3d at 249. Thus, without a constitutional violation, there can be no supervisory liability. *See Estate of Henson v. Callahan*, 440 F. App'x 352, 357 (5th Cir. 2011) ("The causation prong explicitly requires an underlying constitutional violation before holding a supervisor liable."). Here, Plaintiff's inability to demonstrate a violation of Swartz's constitutional rights is fatal to any theory of supervisory liability.

### 2. *Municipal Liability Under 42 U.S.C. § 1983*

"A municipal liability claim under § 1983 requires a showing that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (quotation omitted). Once again, because Plaintiff has failed to demonstrate a violation of Swartz's constitutional rights, Plaintiff concomitantly has failed to establish that an official policy was the moving force behind any such violation. *See, e.g.*, *Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013) ("All of [the plaintiff's] inadequate supervision, failure to train, and policy, practice, or custom claims fail without an underlying constitutional violation."). *See also City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (explaining that "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable *if it actually causes injury*" (emphasis added)).

### 3. *Conspiracy Under 42 U.S.C. § 1985*

Finally, there can be no conspiracy to violate Swartz's constitutional rights where no constitutional violation occurred. *See Whitley*, 726 F.3d at 649 ("A conspiracy claim is not actionable without an actual violation of section 1983."

(cleaned up)). Thus, assuming Plaintiff has pleaded a § 1985 claim, it must be dismissed.

## D.    PLAINTIFF'S STATE-LAW CLAIMS

Because Plaintiff's constitutional claims fail, all that is left are Plaintiff's state-law claims for medical negligence brought under the TSS. Those state-law claims are only brought against the Healthcare Defendants. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental or pendent jurisdiction over state-law claims when it has dismissed all claims over which it has original jurisdiction. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). "When all federal claims are dismissed prior to trial, the general rule in this Circuit is for the district court to decline exercising jurisdiction over the remaining state law claims." *Cooper v. Dart Area Rapid Transit*, No. 3:14-CV-3832-B-BH, 2015 WL 9703716, at *3 (N.D. Tex. Dec. 18, 2015).

Following this general practice, I recommend the Court decline to exercise supplemental or pendent jurisdiction over any state-law claims raised by Plaintiff and remand those claims to state court.

## CONCLUSION

For the above reasons, I recommend that the Court **GRANT** both Galveston County's and the Healthcare Defendants' motions for summary judgment on Plaintiff's federal constitutional claims. Because only federal claims are brought against the Galveston County, I recommend the Court **DISMISS** Galveston County from the case. I further recommend the Court **DECLINE** to exercise supplemental jurisdiction over the remaining state-law claims and **REMAND** those claims to the 405th Judicial District Court of Galveston County, Texas.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an

aggrieved party from attacking the factual findings and legal conclusions on appeal.

Signed on this 12th day of August 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE